UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PAUL D. SERGER,
PLAINTIFF

VS.

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
DEFENDANT

CASE NO. 1:07CV402
(WEBER, J.)
(HOGAN, M.J.)

## REPORT AND RECOMMENDATION

Plaintiff filed his application for disability benefits in September, 2003. Plaintiff's application was denied both initially and upon reconsideration. Plaintiff then requested and obtained two hearings before an Administrative Law Judge (ALJ) in November, 2005 and March, 2006. Plaintiff testified at the hearings as did Vocational Expert (VE), William T. Cody. The ALJ reached an unfavorable decision in August, 2006, following which Plaintiff processed an appeal to the Appeals Council. In April, 2007, the Appeals Council denied review. Plaintiff timely filed his Complaint seeking judicial review in May, 2007.

## STATEMENTS OF ERROR

Plaintiff asserts that the ALJ committed four errors prejudicial to the just determination of his case. First, Plaintiff asserts that the ALJ gave insufficient weight to treating neurologist, Dr. Pagani. Second, Plaintiff asserts that the ALJ erred by failing to find that Plaintiff met Listing 11.09(C). Third, Plaintiff asserts that the ALJ improperly assessed his credibility and subjective complaints. Fourth, Plaintiff asserts that the ALJ erred by using the Grid Rules alone to evaluate his non-exertional impairments.

## THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff's impairments of multiple sclerosis and osteoarthritis of the knees were severe impairments, but that neither, either alone or in combination, met any Listing. The ALJ further found that Plaintiff could perform sedentary work and was not disabled.

## PLAINTIFF'S TESTIMONY AT THE HEARINGS

Plaintiff appeared at the first hearing in a wheelchair, which he explained was for traversing long distances; otherwise he uses a cane all the time and has for the last 3-5 years. Plaintiff testified that he was a firefighter until he was injured on the job in March, 1996 and retired in 1997 as a lieutenant. After that, he and a partner ran a screen company until he became unable to work and his partner, Joseph Stoeckel, bought him out after Plaintiff demonstrated that he could not handle the office side of the business, requiring one partner to work inside and the other in the field. (See Tr., Pg. 266). He described his multiple sclerosis (MS) as becoming progressively worse with the passage of time. Plaintiff was able to work as a Cincinnati firefighter, despite his MS, which was first diagnosed in 1987, but the disease worsened after he injured his right knee when he stepped into an open manhole. Plaintiff treated with Dr. Heath, a neurologist, who died in early 2000, and then he resumed treatment with Dr. Pagani. Plaintiff's right knee was the subject of three surgeries, one before the accident in 1996 and two as a result of that accident. (Tr., Pgs. 312-319).

Testimony taken at the second hearing indicated that Plaintiff was 52 years of age, 5'9" tall and weighed 170 lbs., was right handed, a high school graduate and married. He is a licensed driver, but drives infrequently since suffering a seizure in 2002. Prior employment was as a pony keg co-owner and home builder, jobs he was able to maintain for eleven years after commencing work as a firefighter. Firefighters work a 24-hour shift and then are off duty for 48 hours. After suffering the knee injury, Plaintiff was put on light duty by the fire department for a one-year period before being medically retired on a disability, for which he receives approximately $2,400 per month.

Plaintiff testified that his legs shake and get weak. He also said that his hands get numb and that he suffers from fatigue after any form of repetitive activity. He takes a shot of Betaseron

2

every night. When asked if he could perform sedentary work in his present condition, Plaintiff responded in the negative because of poor memory, fatigue and visual problems. (Tr., Pgs. 324-345).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ asked the VE a series of hypothetical questions, each based on a different set of assumptions. The first asked the VE to assume the accuracy of the report submitted by Dr. Jennifer Wischer Bailey. The VE responded that Plaintiff would be unable to perform competitive work. The second hypothetical, which the ALJ ultimately accepted, asked the VE to assume the accuracy of Dr. Freihofner's assessment. The VE indicated that Plaintiff could perform the jobs of bookkeeper and clerical worker, both of which are prevalent in the regional and national economies. The third hypothetical asked the VE to assume the accuracy of Dr. Pagani's report. The VE responded that Plaintiff could not perform any work. (Tr., Pgs. 345-350).

## THE MEDICAL RECORD

Jennifer Wischer Bailey, M.D., an examining, but non-treating physician, reported in February, 2004 that Plaintiff was diagnosed with multiple sclerosis in 1987. He continued to work as the MS was "largely inactive." Following knee surgery in 1996, he had a "severe post-operative infection," which required "prolonged placement of an intravenous catheter and antibiotic use, which rapidly escalated his multiple sclerosis symptoms." His symptoms were "intermittent double vision, severe headaches, bilateral hand and feet numbness, memory loss, inability to focus, tremors and increasing weakness in his legs, hips and the large muscles of his shoulders." Plaintiff also reported stiffness and pain in his right knee and a 20-year history of back pain. Dr. Bailey determined that Plaintiff had "significant right knee osteoarthritis, weakness and loss of motion" in his right knee as well as "worsening symptoms of multiple sclerosis despite appropriate treatment." She found him "incapable of performing even a mild amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects." He would have difficulty reaching, grasping and handling objects, but had no

visual or communication limitations. (Tr., Pgs. 124-127).

Muscle testing of Plaintiff's shoulder abductors, hip flexors and hip extenders was in the "fair" range, but all other muscle groups were rated as "good." Plaintiff demonstrated normal grasp, manipulation, pinch and fine coordination, but he would not be able to so test if his multiple sclerosis was active and his hands were weak and numb. Dr. Bailey observed "diffuse muscle spasm," but no muscle atrophy. (Tr., Pgs. 128-131).

In February, 2004, Plaintiff presented to the Emergency Room at Jewish Hospital after suffering his first generalized seizure. A CT of the head was normal. Plaintiff was admitted, but discharged the next day after taking Ativan and conferring with Dr. Pagani, who prescribed Tegretol, an anti-seizure medication. (Tr., Pgs. 135-159). Plaintiff was transported to the hospital by the emergency squad.

Anton Freihofner, M.D., a paper reviewer, completed a physical residual functional capacity assessment in March, 2004. Dr. Freihofner opined that Plaintiff could lift 20 lbs. occasionally and 10 lbs. frequently. He could stand about 6 hours in a workday and sit for 6 hours. He had no visual nor communicative limitations, but should not be exposed to extreme heat, nor environmental hazards. Gary Hinzman, M.D. concurred. (Tr., Pgs. 176-182). It is significant that Dr. Friehofner was the only expert whose consideration was limited to Plaintiff's condition before March 31, 2002, the date last insured.

In June, 1996, Dr. Cleves, Plaintiff's primary care physician, referred him to Daniel Chase, M.D., a maxillofacial surgeon and ear, nose and throat specialist, for evaluation of a hearing loss and vertigo. Plaintiff had a sensation of falling to the left. Although Dr. Chase wanted to complete some tests, he felt the vertigo was caused by Plaintiff's previously diagnosed condition of multiple sclerosis. (Tr., Pgs. 232-233).

In July, 1994, Plaintiff saw Eric Orenstein, M.D. of the Freiberg Orthopaedic Group for a swollen right knee, which Plaintiff injured in a fall against a concrete step while working as a fireman. Dr. Orenstein found no fracture or dislocation, but "moderate degenerative arthritis." He aspirated the knee and injected it with Xylocaine. Dr. Zenni had done a medial meniscectomy about 20 years previous, so the diagnosis was synovitis of the right knee. (Tr., Pg. 244).

4

A residual functional capacity assessment was done by Luis Pagani, M.D., a neurologist with Riverhills Health Care, Inc. in October, 2005. Dr. Pagani listed his patient's symptoms as fatigue, balance problems poor coordination, weakness, unstable walking, numbness or tingling, sensory disturbance, increased muscle tension, bladder problems, bowel problems, sensitivity to heat, pain, difficulty remembering, depression, emotional lability, difficulty solving problems, double or blurred vision and difficulty with speech or communication. Dr. Pagani stated that his patient was not a malingerer. Dr. Pagani's opinion was that Plaintiff's fatigue was typical of MS patients, that he could walk approximately one block without rest, could continuously sit for more than 2 hours, and continuously stand for 10 minutes. Plaintiff could sit/stand/walk for less than 2 hours in a workday. Dr. Pagani's opinion was that his patient could occasionally lift 10 lbs., but should never lift 20 lbs. During a workday, Plaintiff would be able to use his arms, hands, fingers approximately 10% of the time. He should avoid all exposure to hazards and extreme heat, avoid even moderate exposure to extreme cold and fumes, avoid concentrated exposure to wetness and humidity and should never stoop or crouch. Plaintiff would be absent from work more than four times per month. (Tr., Pgs. 258-263).

R. Scott Jolson, M.D. treated Plaintiff postoperatively in April, 1997 for continued swelling and stiffness in his right knee. He was treated with arthroscopic debridement and removal of a lateral meniscus tear. The current status as of April, 1997 was that Plaintiff "has a slight cintracture of -5 with full flexion, good quadriceps tone with minimal discomfort, but positive findings consistent with a chronic ACL tear." (Tr., Pgs. 268-269). Dr. Jolson recommended ACL reconstruction to relieve instability.

On June 6, 1997, Plaintiff applied for disability retirement with the Police and Firemen's Disability and Pension Fund, and on June 28, 1997 was medically separated from the Fire Division by Assistant Chief Robert Wright. (Tr., Pgs. 270-277).

Scott Heath, M.D. reported in April, 1997 that Plaintiff had been treated for 10 years for multiple sclerosis and as a result of multiple rounds of antibiotics, suffered an increased neurological impairment to his previously existing condition. (Tr., Pgs. 278-284).

Plaintiff was examined in August, 1997 by Gerald Steiman, M.D., a neurologist. The history provided to Dr. Steiman was that Plaintiff first injured his right knee in 1971 while

5

playing football. Surgery was performed. In 1986, Plaintiff began his employment with the Fire Division and in 1987 was diagnosed with multiple sclerosis. He was treated by Dr. Heath during this period. In 1997, Plaintiff reinjured his right knee when he stepped into an open manhole. Dr. Orenstein performed arthroscopy with chondroplasty and partial synovectomy and debridement of an ACL tear. Plaintiff developed a post-operative infection, which required several months of intravenous antibiotics. A second surgery was performed by Dr. Jolson, who performed arthroscopy and debridement with a partial lateral meniscopy, synovectomy and manipulation. The multiple rounds of antibiotics increased his neural impairment.

Dr. Steiman said that Plaintiff had an unstable right knee, numbness and tingling with his hands and reduced sensation. He cannot walk for more than 1/4 mile and has difficulty standing for longer than 30 minutes and sitting for longer than 1 hour. Dr. Steiman's opinion was that Plaintiff is "permanently incapacitated from performance of his duty as a firefighter, but capable of performing other remunerative employment." (Tr. Pgs. 286-289).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected

6

to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).  Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520.  First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends.  Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends.  Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).  Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment.  If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities.  20 CFR §404.1520(c).  Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting.  20 CFR §404.1521(b). Plaintiff is not required to establish total disability at this level of the evaluation.  Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act.  *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir.1984).   The severity requirement may be employed as an administrative convenience to

7

screen out claims that are totally groundless solely from a medical standpoint. *Higgs v. Bowen*, No. 87-6189, slip op. at 4 (6th Cir. Oct.28, 1988). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985)(citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The Secretary's decision on this issue must be supported by substantial evidence. *Mowery v. Heckler*, 771 F.2d 966 (6th Cir. 1985).

The Commissioner is required to consider plaintiff's impairments in light of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing). The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 404.1525(a). If plaintiff suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of plaintiff's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff's impairment need not precisely meet the criteria of the Listing in order to obtain benefits. If plaintiff's impairment or combination of impairments is medically equivalent to one in the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment. 20 C.F.R. § 404.1526(a). The decision is based solely on the medical evidence, which must be supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1526(b).

If plaintiff's alleged impairment is not listed, the Commissioner will decide medical equivalence based on the listed impairment that is most similar to the alleged impairment. 20 C.F.R. § 404.1526(a). If plaintiff has more than one impairment, and none of them meet or equal a listed impairment, the Commissioner will determine whether the combination of impairments is medically equivalent to any listed impairment. *Id.*

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability

8

to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson v. Secretary of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam) (emphasis in original); *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). Taking notice of job availability and requirements is disfavored. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 536-37 n.7, 540 n.9 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). There must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *Richardson*, 735 F.2d at 964; *Kirk*, 667 F.2d at 536-37 n.7. The Commissioner is not permitted to equate the existence of certain work with plaintiff's capacity for such work on the basis of the Commissioner's own opinion. This crucial gap is bridged only through specific proof of plaintiff's individual capacity, as well as proof of the requirements of the relevant jobs. *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980)(citing *Tayor v. Weinberger*, 512 F.2d 664 (4th Cir. 1975)). When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that plaintiff can perform. *Born v. Secretary of H.H.S.*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927-28

9

(6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994).

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan v. Secretary of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Jones v. Secretary of H.H.S.*, 945 F.2d 1365, 1369 (6th Cir. 1991). This test, however, "does not require . . . 'objective evidence of the pain itself.'" *Duncan*, 801 F.2d at 853. Where a complaint of pain is not fully supported by objective medical findings, the Commissioner should consider the frequency and duration of pain, as well as other precipitating factors including the effect of the pain upon plaintiff's activities, the effect of plaintiff's medications and other treatments for pain, and the recorded observations of pain by plaintiff's physicians. *Felisky*, 35 F.3d at 1039-40.

Where the medical evidence is consistent, and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence conflicts, and there is substantial evidence supporting and opposing a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker*, 708 F.2d 1058,

1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above. *Felisky*, 35 F.3d at 1039-41.

In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Kirk*, 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985)(citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

"In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.,* 708 F.2d 1048, 1054 (6th Cir. 1983). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Walters*, 127 F.3d at 530. If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). The opinion of a non-examining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physicians. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). If the ALJ rejects a treating physician's opinion, the ALJ's decision must be supported by a sufficient basis which is set forth in his decision. *Walter v. Commissioner*, 127 F.3d 525, 529 (6th Cir. 1997); *Shelman*, 821 F.2d at 321.

## OPINION

Plaintiff's first Statement of Error is that the ALJ gave insufficient weight to Luis Pagani, M.D., who is Plaintiff's treating neurologist. The records establish that Drs. Heath and Pagani were partners at Riverhills Health Care, Inc. until Dr. Heath died sometime in late 1997 or thereafter. Plaintiff first saw Dr. Pagani in 1987, but saw him exclusively after Dr. Heath died. Dr. Pagani is a neurologist as was Dr. Heath. One with multiple sclerosis would see a neurologist or a specialist trained to diagnose and treat disorders of the brain or nervous system. Dr. Pagani's opinion is entitled to particular weight because he is a specialist and has the benefit of a lengthy relationship with Plaintiff as did Dr. Heath. Together, the two physicians observed and examined Plaintiff for approximately 18 years. In light of the nature of multiple sclerosis, which no one disputes that Plaintiff has and has had since 1987, when an MRI demonstrated the multiple white matter lesions, characteristic of multiple sclerosis, one must be particularly wary of one time examiners and reviewers, who may have caught Plaintiff on a "good day."

On the other hand, Plaintiff's date when he was last insured was March 31, 2002, so his condition as of that date is the crucial factor, not his condition subsequently. Dr. Pagani's report, dated October, 2005, provides strong evidence that Plaintiff was disabled as of that date, but his office notes from 2000 to 2002 don't demonstrate disability before the date last insured. Rather, Plaintiff's walk was stiff and he had some spasticity in his legs. He had a normal neurological examination, except for an absent reflex in his right knee. Otherwise, Plaintiff's treatment consisted of changes in medications and doses. It is clear that Plaintiff's condition began to worsen after his bout with antibiotics to cure an infection resulting from his knee surgery in 1996 and that it apparently bottomed out with his hospitalization for generalized seizures in 2004. However, when Dr. Pagani indicated that the limitations he listed in his report of October, 2005 applied as of October, 2003, at the earliest, then the evidence of disability as of March, 2002 is rather sparse and does not meet Listings 11.09(C) or 12.05(C).

Since Dr. Bailey's examination occurred in February, 2004, she voiced no opinion about Plaintiff's condition before the date last insured, although she strongly supported Dr. Pagani's view after the date last insured. The ALJ was left to consider Plaintiff's medical condition from the viewpoint of Drs. Freihofner and Hinzman, paper reviewers to be sure, but specifically instructed

to voice an opinion of Plaintiff's condition as of the date last insured, although their review took place in March, 2004. Drs. Freihofner and Hinzman found Plaintiff capable of light work, an opinion the ALJ did adopt completely accept because the ALJ found Plaintiff able to perform sedentary work during the relevant period. Dr. Steiman's opinion that Plaintiff could no longer perform as a fireman, but could do less strenuous work in 1997 is obvious, but not particularly helpful in resolving the issue at hand, and the reports of Drs. Orenstein and Jolson indicate that Plaintiff has an unstable knee, facts which would not preclude sedentary work.

Somewhat reluctantly, we must conclude, as did the ALJ, that neither the Pagani/Bailey analysis, nor the Freihofner/Steiman analysis was controlling, but to arrive at a medium position with respect to Plaintiff's ability to perform the physical requirements of the job, such as walking, standing and lifting. That is essentially what the ALJ did by her finding that plaintiff could perform sedentary work. The analysis is not, however, complete unless we also consider Plaintiff's cognitive and memory problems. Although his business partner provided a letter supporting Plaintiff's testimony that he was unable to function in a sedentary office environment in 1999, neither Dr. Bailey nor Dr. Pagani found any cognitive or memory problems during the insured period. After a careful consideration of the record, we cannot disagree with the analysis of the ALJ relative to this Statement of Error.

Plaintiff's second Statement of Error is that the ALJ failed to find that Plaintiff met Listing 11.09(C), which requires: (1) Disorganization of motor function, meaning significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements or gait and station, (2) Visual or mental impairment, meaning an impairment of visual acuity, contraction of peripheral visual fields, loss of visual efficiency or an organic mental disorder, and (3) Significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in area of the central nervous system known to be pathologically involved by the multiple sclerosis process. The medical record establishes one of the three requirements, that being reproducible fatigue and that symptom has not been shown to occur before the date last insured. The ALJ was clearly correct when she found that Plaintiff "did not meet or medically equal one of the Listed impairments."

13

The next Statement of Error is really a mixture of miscellaneous complaints about the ALJ's reasoning process and brought under the heading of "The credibility and subjective complaints." We agree that a 1997 examination by Dr. Steiman, concluding that Plaintiff was able to work, was before his onset date of December 31, 1998, but the ALJ simply used that as a starting, not ending, point in her analysis. Everyone, including the ALJ realizes that MS is a progressive disease, but often does not progress steadily, but rather ebbs and flows. The ALJ found it necessary to begin with Dr. Steiman's report because of the relationship of Plaintiff's right knee impairment upon his MS. There was no error.

Next Plaintiff faults the ALJ for failing to conclude that because Plaintiff took Bataseron for MS and had tremors, difficulty writing and double vision, that he should be proclaimed disabled before the date last insured. This is simply restating what has been previously established, that Plaintiff has MS and a number of symptoms characteristic of MS, but that during the insured period, he did not have them to a disabling degree, although he probably does now.

With regard to Plaintiff's argument that Dr. Freihofner found that Plaintiff symptoms were proportionate to the medical findings, we simply do not know what Plaintiff is trying to establish. Dr. Freihofner found Plaintiff able to perform more strenuous work than the ALJ and the ALJ rejected that opinion and instead formulated her decision in accordance with the trend, which was that Plaintiff's symptoms were getting worse. There was no error.

Then there is the comment about the ALJ's failure to award Plaintiff for his good work record. Again we do not understand the point. Plaintiff actually had three jobs, not two, at one time and had been able to function with MS for a considerable period of time. The injury to his knee in 1997 and the unexpected infection following surgery threw a wrench into a quite ambitious life plan. No one accuses Plaintiff of being a malingerer at any point and certainly not Dr. Pagani, his treating neurologist. The ALJ simply noted that Plaintiff's use of a wheelchair on the date of the hearing seemed prudent, but the ALJ did not believe that Plaintiff needed a wheelchair four or five years previously, contrary to Plaintiff's statement that he did. The medical evidence is in accord with the ALJ's credibility finding, but our opinion, for what it is worth, is that the need for and use of a wheelchair before the date last insured is a highly subjective thing which is not developed in the record. We do not know, for instance, whether Plaintiff's prior use of a wheelchair was used because

14

of endurance problems, lack of stability or simply as a means to prevent falls. This argument seems be in the nature of "Much Ado About Nothing" and the ALJ's treatment of the subject hardly rises to the level of prejudicial error.

The last Statement of Error is that the ALJ used the Grid Rules improperly. The alleged impropriety is that the ALJ used the grid Rules alone when Plaintiff's impairments were not restricted to exertional limitations, but included visual and memory difficulties, use of a cane and problems with the hands. Although the principle asserted is correct under Social Security Rule 83-10, its application to the instant case is problematic. Although Plaintiff did report double vision to Dr. Pagani in December, 2002, there is no reference to such a report within the insured period. Although Plaintiff did exhibit "gait ataxia," meaning irregular or uncoordinated, when examined by Dr. Steiman in August, 1997, there is no indication that Plaintiff was so unsteady so as to require a cane, although Dr. Steiman found him to be unsteady. Even if Plaintiff was so unsteady as to require a cane, this would not disqualify him from sedentary work. Although Plaintiff has demonstrated both numbness and tingling in his hands and memory problems after the date last insured, there is no evidence of either during the insured period.

## CONCLUSION

Because substantial evidence supports the ALJ's decision in this case, the decision should be affirmed and this case dismissed from the docket of the Court.

October 2, 2008

Timothy S. Hogan
United States Magistrate Judge